ENRIQUE VELÁZQUEZ TORRES, Plaintiff and Appellant, *v.* JUANA VELÁZQUEZ MORALES, Defendant and Appellee.

No. 11753. Submitted April 14, 1961.—Decided May 16, 1961.

*Práxedes Alvarez Leandri* for appellant. *Carlos E. Colón* for appellee.

Mr. Justice Blanco Lugo delivered the opinion of the Court.

Marcos Velázquez Santiago, also known as Marcos Ramos, died in Ponce on March 30, 1950. By judgment of the former District Court of said city, his widow Isabel Sabater and his two recognized natural daughters named Juana Velázquez Morales and Rosa María Velázquez Caquías, were declared as his sole and universal heirs. After having paid the inheritance tax, the aforesaid persons proceeded to the liquidation and division of the inheritance estate, executing the corresponding public deed. Four lots without buildings were adjudicated to the Velázquez sisters in payment of their shares.

On March 1, 1951, the aforesaid sisters and the plaintiff, Enrique Velázquez Torres, executed a public deed which they entitled deed of sale and division of material property, in which (*a*) they "sold" to the plaintiff a share of one half in two of the lots located in the Clausells ward and Vives Street in Ponce, for the total sum of $1,625, which the vendors confessed they had received prior to the execution, and (*b*) the community existing between the defendant and her sister Rosa María, was divided. The latter was adjudicated the rest of the co-ownership of one half of the lot and the house on Vives Street. Afterwards, Rosa María sold this share to

the plaintiff, who by virtue thereof came to be the sole owner of the lot.[1] The aforesaid deed was explained on the same date by a private document subscribed by the Velázquez sisters and their brother.[2] As appears from this document, Rosa María and Enrique, each one owed Juana the sum of $714.84, which they later paid. This amount represented the difference between the adjudications of the inherited estate.

The evidence shows that the plaintiff was an illegitimate child of the ancestor whom the widow refused to acknowledge by virtue of a deed prepared for said purpose. However, his two sisters agreed to acknowledge him and to adjudicate him a share of the property equivalent to the share to which

---

[1] Said lot which the deceased, Marcos Velázquez had acquired by purchase on March 28, 1910, is described in the registry, as follows:

"Lot located on the ward Segundo, on Vives Street in this city of Ponce, measuring ten meters, four hundred forty-nine millimeters front and forty-one meters and seven hundred ninety-five millimeters in depth, making an area of four hundred thirty-six square meters with seven hundred eleven millimeters, bounded on the North by Heirs of Abelardo Otero, formerly, now Marcos Velázquez Santiago; on the South by Vives Street; on the East by María Antonia Arroyo, formerly, now Marcos Velázquez Santiago; and on the West, by Aguedo Márquez, formerly, now Marcos Velázquez Santiago. Recorded at Volume 577 of Ponce, page 90, property number 4303 quadruplicate, tenth inscription."

[2] The private document reads as follows:

"We, Juana Velázquez Morales, Rosa María Velázquez Caquías, and Enrique Velázquez Torres, known as Enrique Ramos Torres, assembled in this city of Ponce on the first day of March of nineteen hundred fifty-one, hereby state:

"That as heirs of Marcos Velázquez Santiago, known as Marcos Ramos, we have divided among us the property which corresponded to us on his death in the manner which appears in the public deed executed on this day . . . that although it does not appear that any one of the heirs owes the other anything, the truth is that as a result of the evaluation of the divided property, Rosa María Velázquez Caquías and Enrique Velázquez Torres, known as Enrique Ramos Torres, owe Juana Velázquez Morales the sum of seven hundred fourteen dollars and eighty-four cents ($714.84), because since the share of each heir was valued at three thousand two hundred ninety-six dollars and nineteen cents ($3,296.19), and since the property adjudicated to Juana Velázquez Morales was valued at the amount of two thousand five hundred eighty-one dollars and twenty-five cents ($2,581.25), there is a difference in value of seven hundred fourteen

he would have been entitled as heir if said deed had been signed.[3]

The defendant Juana Velázquez had acquired in 1949 through purchase from her father a lot on Molina Street[4] adjacent to that owned by the plaintiff on Vives Street. This lot was *not* a part of the inheritance estate which was divided among the three, two sisters and the brother. Although in the Registry it appears with an area of 555.12 square meters, a survey made within a suit for limitation of boundaries between the same parties showed that it measured 540.375 square meters.

---

dollars and eighty-four cents ($714.84), which *was given to us in excess in the operation effected by means of the public deed executed on this day*, mentioned above, and we, Rosa María Velázquez Caquías and Enrique Velázquez Torres, known as Enrique Ramos Torres, hereby bind ourselves to pay to Juana Velázquez Morales said sum of seven hundred fourteen dollars and eighty-four cents as soon as we sell the two urban properties *adjudicated to* us by said deed.

"We hereby state that we have agreed to give Marcos Antonio Rivera the sum of three hundred dollars ($300.00) and to Esteban Font, known as Ñeñe, the sum of three hundred dollars ($300.00) and that said sum will be paid as soon as we sell the inherited properties.

"In testimony whereof, we hereby sign the document, in triplicate, in this city of Ponce, today, first day of March of nineteen hundred fifty-one.

"(Signed) Rosa María Velázquez Caquías
(Signed) Enrique Velázquez Torres
(Signed) Juana Velázquez Morales"

[3] All along the testimony of the parties the situation is described as being such. By way of illustration we shall point out typical statements: the plaintiff, Enrique Velázquez said "(The intention since the beginning was) That we would divide the property of the deceased, my father, among the three of us. When . . . drafting the document of acknowledgment where I was included, my father's widow refused to do so. Then he . . . had to draft another document and they bound themselves to acknowledge me . . . ." (Tr. Ev., p. 65); and the defendant, Juana Velázquez, when explaining the acknowledgment stated that, "He was simply my brother and was not recognized, by the widow, as she did not agree to that, and when I was recognized, as their older sister, then voluntarily because of affection, because I love my brother and that . . ." (Tr. Ev., p. 92.)

[4] The defendant's lot which was acquired by Marcos Velázquez in 1914 is described as follows:

"URBAN: Lot on Molina Street in Ponce, with a square area of five hundred fifty-five meters and twelve square centimeters, bounded

In the year 1912 the deceased, Marcos Velázquez, had established a coach rental business on the lot at Vives Street. When he bought the lot on Molina Street the coaches drove in through Vives Street and went out on Molina Street. For the purpose of operating said business, certain area was devoted to a stable and the stable was separated by a fence from the place devoted to parking of the coaches which was part of the lot on Vives Street. This area is the one precisely claimed by the plaintiff in the present action[5] to be part of the area of the lot on Vives Street and that the defendant alleges is located within the area of her lot on Molina Street. As to said particular the trial court settled the conflict in the evidence by determining that "the lot of 540.375 square meters of the defendant does not include any part of the lot belonging to the plaintiff." It also concluded that "when the title of the lot described in the complaint was transferred to the plaintiff, said lot was fenced, and he received it for what was enclosed within its boundaries at that time."[6]

The Superior Court, Ponce Part, dismissed the complaint. It held: (a) that the deed of March 1, 1951, although entitled a deed of sale, was really a donation, and consequently the plaintiff had nothing to claim, and (b) that if it were considered of sale, since the contract was not based on a unit

---

on the North, by Luz María Príncipe, Marcos Velázquez Santiago, and *María Laguna;* on the South by Marcos Velázquez Santiago and Manuel de Jesús Colón Rosaly; on the East by Marcos Velázquez Santiago and *Juana Arroyo;* and on the West by Molina Street."

[5] The action was entitled declaratory judgment, but obviously, its purpose was to claim a specific portion of the land. The prayer reads: "The defendant. . . prays for declaratory judgment stating that he is the owner of the piece of land of 88.064 square meters, the defendant having granted and transferred it to him. . .that said defendant is not the owner of said piece of land . . ."

[6] There is no controversy as to the fact that the plaintiff's lot which was "fenced" and "enclosed within its boundaries at that time" has an area of only 348.646 square meters, that is, 88.064 square meters less than in the recorded area. The problem in this case is that the total area of both lots pursuant to the title is 991.831 square meters, while the total area of both resulting from the survey made is 889.021 square meters.

price per meter, the vendors were not bound to answer for the deficiency in the area, and that, in any case, the action had prescribed because more than six months had elapsed since the execution of the deed until the filing of the present action.

## I

To decide the controversy raised, it is necessary that we first determine the true nature of the deed executed on March 1, 1951, by the two Velázquez sisters and their brother.

Section 2 of Act No. 229 of May 12, 1942 (Sess. Laws, p. 1296, 31 L.P.R.A. § 502) provides that children born out of wedlock prior to the effective date[7] of this Act and who lack the qualification of natural children according to previous legislation,[8] may be recognized for *all legal purposes* by the voluntary action of their parents, and in their default by that of the persons having the right to inherit therefrom. The "legal purposes" referred to in this Act are the rights mentioned in § 127 of the Civil Code, 1930 ed. (31 L.P.R.A. § 506): (1) to use the surname of the parent making the recognition; (2) to be supported by the same; (3) to receive the hereditary portion determined in the Code.

As to the right to use the surname of the father, § 2 of Act No. 229 of 1942, *supra*, was amended by Act No. 243 of May 12, 1945 (Sess. Laws, p. 814) and a provision was added to the effect that in the absence of voluntary recognition referred to in the first paragraph of said section, the children who lacked the qualification of natural children according to previous legislation will be considered as such

---

[7] Because the approval of two thirds of the members elected for each house was not obtained, Act No. 229 went into effect 90 days after its approval, that is, on August 10, 1942.

[8] Section 125 of the Civil Code, 1930 ed. (31 L.P.R.A. § 504) provides that: "Natural children are those born out of wedlock, from parents who, at the moment when such children were conceived or were born, could have intermarried with or without dispensation."

for the only purpose of starting the action of filiation to obtain the surname of their father. Such action shall be prosecuted in accordance with the "proceedings" fixed by the Civil Code of Puerto Rico for the recognition of natural children. In other words, they were authorized to start the action of filiation without patrimonial consequences, and were denied access to the courts when the result was the participation in the distribution of the inheritance left at the death of the father.

Now, the legislator did not entirely foreclose the opportunity of the illegitimate child born prior to 1942 to participate in the inheritance of his father, and determined he could do so when he was recognized voluntarily by his father and in default thereof by *the persons having the right to inherit therefrom*. This last classification can only include such heirs as may be affected by the arrival of an additional heir, who upon being included among the persons having a *right* to the inheritance, will reduce the forced or legal portion of the other heirs which voluntarily recognized him. And, obviously, among these affected heirs in the present case, the widow is not included, whose quota in usufruct could not diminish because of the addition of a natural son as a person with a right to the inheritance, because when the recognition took place, whatever share corresponded to her in the inheritance had already been liquidated upon adjudicating to her a house and lot on Vives Street.

As to the recognition by "voluntary action" of the parents, we have decided in *Correa* v. *Heirs of Pizá*, 64 P.R.R. 938 (1945) that a recognition by a birth certificate, will, *or any other public document*, is required. *Ramos* v. *Rosario*, 67 P.R.R. 641 (1947); *Eliecer* v. *Heirs of Cautiño*, 70 P.R.R. 407 (1949); *Cortés* v. *Cortés*, 73 P.R.R. 643 (1952). Furthermore, said recognition ought to have been made subsequent to the effectiveness of Act No. 229. *Fernández* v. *Heirs of Fernández*, 66 P.R.R. 831 (1947); *Rossy* v. *Mar-*

*tínez*, 70 P.R.R. 703 (1949). However, when the recognition is by voluntary action of the heirs, the recognition in the birth certificate and by will, is excluded. For the purpose of this case, and without seeking to establish the definite rule in this particular, we understand that the act of the sisters, Juana and Rosa María Velázquez in executing the deed of sale to which we have referred, considered jointly with the private document subscribed on the same date in order to explain the true nature of said deed, constitutes a voluntary act of recognition of the plaintiff Enrique Velázquez. As we have previously stated, the widow's consent was unnecessary as her hereditary rights were not affected by said recognition.

 Having laid down these antecedents, it is easy to fix the true nature and the proper scope of the deed of sale, which really, was nothing more than the partition or division of the inheritance estate left upon the death of the father of the executing parties. Therefore, it is not a donation, as the trial court decided, nor a deed of sale, as the parties stated. In our opinion the trial court erred in considering that the plaintiff had no right to inherit because he had not been legally recognized, and that therefore the conveyance made to him by his two sisters was merely due to their generosity. But this error, as we shall see, is not a reversible error.

It has been discussed by the case law whether the warranty lies when an heir is awarded a property with a certain area and it later appears to have a smaller area. It is known that the partition having been made, the coheirs are mutually bound to guarantee all the property awarded, § 1022 of the Civil Code (31 L.P.R.A. § 2902), and that the partition may be rescinded by reason of lesion, exceeding the fourth part, taking into consideration the value of the things, at the time they were awarded, § 1027 of the Civil Code (31 L.P.R.A. § 2912). As to the obligation of warranty in the case of a

reduction in the area, it is doubtful whether such an obliga-- tion lies since the heir has not really been deprived of any right by a third person. Manresa[9] expresses himself thus: "If the property was evaluated at so much per unit of area, there is only one error of evaluation that may cause the res-- cission for lesion in that case. If it was evaluated as a whole, not even that remedy is left, unless there is an error in the evaluation." Apparently it is assimilated by the alleged sale for a lump sum or by unit of area in the contract of sale.[10] (Sections 1358 and 1360 of the Civil Code, 31 L.P.R.A. §§ 3818 and 3820.) Beltrán de Heredia[11] states the following:

"Similarly we have the case in which a proportionate ad- judication is made, but it later appears that one of the properties awarded has a smaller area than that appearing in the adjudi-- cation.

"Although there have been textwriters who have tried to include these cases within the concept of warranty, however, it is unquestionable that the indispensable requisite which is the claim of a third person with a right to that or those prop-- erties, is missing. It is rather the case of a simple material error or of evaluation which may be remedied, in both cases, by a simple rectification of the partition made, or if necessary, by exercising the right of action of boundaries or survey; perhaps even the revendicatory action could be filed by the heir, whose right is fully recognized in the partition deed and who later received less or of less value. Only on the hypothesis that a lesion might occur in its inheritance which would exceed a fourth part, could the rescissory action of § 1073 of the Civil Code be exercised; but in no case I believe can eviction, properly speaking, nor a disturbance or nuisance be considered."

[9] *Comentarios al Código Civil Español* 745–746, 1943 ed., Vol. VII.

[10] In discussing this subject under the heading of warranty of lots, Castán admits this solution and to that effect he states that "According to the scientific doctrine the rules governing the warranty in a sale are applicable to this matter as supplementary." *Derecho Civil Español, Común y Foral* 315, 7th ed. 1960, Vol. 6.

[11] *El Saneamiento por Evicción en la Participación Hereditaria (Revista de Derecho Privado)* 846 (1954) Vol. XXXVIII.

See also, X Laurent, *Principios de Derecho Civil Francés* (1895 ed.) 541–542.

It is inferred from the foregoing that the plaintiff can only bring a rescissory action for lesion, but in such a case it would have to include as defendants all the coheirs.[12] In the present action the plaintiff chose to direct it against his sister Juana, and it is significant he did not include his sister Rosa, specially considering that he derived title from her upon purchasing the one half share which he acquired by sale. We presume that what said plaintiff really sought was to recover the land which according to his title, is missing, but as we shall see later on, he did not succeed in this respect.

## II

Although it is unnecessary for the purpose of this appeal, we would like to add that even if the deed is considered of sale or of donation, still judgment could not be rendered in favor of the plaintiff.

It appears from the deed executed that the share of one half of the lot which was described in said deed as having an area of 436.711 square meters, was acquired by the plaintiff for the lump sum of $1,340 without making any reference to a unit price. Under said circumstances the provisions of § 1360 of the Civil Code first paragraph (31 L.P.R.A. § 3820) would be strictly applicable to the effect that "In the sale of real estate made for a fixed price and not at the rate of a specified sum for a unit of measure or number, the increase or decrease of the same shall not be considered, even when greater or less area or amount than that stated in the contract may be found."[13] Even when it refers to the division

---

[12] A rescissory action by reason of lesion shall prescribe after four years, counting from the time the division was made. Section 1029 of the Civil Code (31 L.P.R.A. § 2914).

[13] When the sale is executed for a lump sum the vendor is bound to give and the buyer to receive all that is included within the boundaries of the immovable sold. *Colón* v. *Batis et al.*, 34 P.R.R. 623 (1925); *Franceschi* v. *Rodríguez*, 27 P.R.R. 823 (1919); Judgments of the Supreme

among coheirs the defendant's testimony which was not contradicted is significant to the effect, that "we made the division in accordance with the evaluation, the price of the evaluation, it had not been measured; in the same way his lot could have been as incomplete as mine." (Tr. Ev., p. 100.) Furthermore it would have been necessary to include as a defendant party his sister Rosa María.

If the deed is considered as a donation, it is clear that the plaintiff could not claim from the donors even if the property donated appeared to have a smaller area. Section 580 of the Civil Code (31 L.P.R.A. § 2025) provides that the donor is not obliged to warrant the things donated, unless the gift is for a valuable consideration or as Castán states, when the donor has acted in bad faith.[14] Under the attendant circumstances in the present case, the action by the defendant and her sister only reveal the best of intention and purpose of avoiding that legal considerations might prevent their brother, the plaintiff, from getting what they believed clearly corresponded him.

 Finally the complaint filed cannot stand as a revendicatory action, because the plaintiff did not prove his title on the share claimed by him nor did he properly identify it, both being indispensable requisites for said action.[15] A careful study of the certificates from the registry and the

Court of Spain of March 2, 1898, January 10, 1901, April 20, 1902, May 9, 1914, July 2, 1914 (Revista de Derecho Privado, p. 492, Vol. I), December 1, 1917 (op. cit. 103, Vol. V), March 29, 1927 (op. cit. 55, Vol. XV). Cf. Suárez v. Suárez, 47 P.R.R. 93 (1934).

[14] Aside from the defect of the deed executed, cf. Santiago v. Rodríguez, 72 P.R.R. 253 (1951), it is relevant to state that the tax levied by Act No. 303 of April 12, 1946 (Sess. Laws, p. 782, 13 L.P.R.A. § 881 et seq.) was not paid. See: Scaevola, Código Civil (1943 ed.) 832, Vol. XI; Colin y Capitant, Curso Elemental de Derecho Civil (1927 ed.) 628, Vol. VII; Castán, op. cit. 196, Vol. 4.

[15] Arce v. Díaz, 77 P.R.R. 589 (1954); Heirs of Meléndez v. Almodóvar, 70 P.R.R. 500 (1949); Sevilla v. Cía. Azucarera del Toa, 69 P.R.R. 231 (1948); Marques v. Colón, 62 P.R.R. 190 (1943); Gerardino v. People, 55 P.R.R. 862 (1940); Ubarri v. Calaf, 44 P.R.R. 296 (1932); Pérez v. Gerena, 41 P.R.R. 106 (1930).

certified copies of the deeds presented in evidence, shows that since its original registration the northern boundary of plaintiff's lot was a lot owned by Abelardo Otero, which was later acquired by the deceased Marcos Velázquez, and which is no other than the lot on Molina Street, at present owned by the defendant. The northern boundary has never been a lot owned by María Laguna, a fact which is indispensable for the plaintiff to prevail since the share claimed extends to the fence which separates it from the property owned by Mrs. Laguna. It is also significant that in the description of the lot owned by the defendant, the lot owned by Mrs. Laguna has always appeared as one of the boundaries on the North and that on the East it appears as bounded by Juana Arroyo, formerly, now Heirs of Santiago Cabrera. If the plaintiff were right, the defendant's lot would be bounded on said cardinal point by the lot on Vives Street only, that is, by the plaintiff himself. As to the identification of the parcel of land claimed, it does not appear to have been described in the allegations and the only reference made is to the area of 88.064 square meters.[16] Even if the allegations were considered as amended by the evidence introduced, the identification would still be insufficient because of the discrepancy existing between the sketch made by the engineer Archevald and the testimony of plaintiff's witnesses. In conformity with said sketch the parcel of 88.064 square meters would not extend to the very boundary line with the lot of María Laguna, but instead it would be separated from the latter by an alley of about 1.50 meters wide. The same situation occurs in regards to the eastern boundary, in relation to the lot of Juana Arroyo. The testimony

---

[16] The plaintiff claims this parcel on the basis of a simple arithmetical operation, that is, subtracting from the area recorded (436.711 sq./m) the area of the parcel as per survey (348.646 sq./m). We point out that the reduction in area is of 88.065 sq./m and not of 88.064 sq./m as it is alleged.

of the witnesses described plaintiff's lot as extending to the aforesaid adjacent lots.

For the foregoing reasons, the judgment rendered by the Superior Court, Ponce Part on December 17, 1954 will be affirmed.

Mr. Chief Justice Negrón Fernández restates his view which he set forth in his dissenting opinion in *Elicier* v. *Heirs of Cautiño*, 70 P.R.R. 407, with respect to the interpretation given to the term "voluntary act" under the provisions of Act No. 229 of 1942.

Mr. Justice Hernández Matos did not participate herein.